John AURIEMMA, et al.,
Plaintiffs–Appellees,

v.

James MONTGOMERY and Donald
Hubert, Defendants–Appellants.

No. 88–1072.

United States Court of Appeals,
Seventh Circuit.

Argued May 18, 1988.

Decided Oct. 21, 1988.

Rehearing and Rehearing In Banc
Denied Dec. 1, 1988.

Judson H. Miner, Corp. Counsel, Chicago, Ill., for defendants-appellants.

John Gubbins, John L. Gubbins & Associates Ltd., Chicago, Ill., for plaintiffs-appellees.

Before WOOD, Jr., and MANION, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

MANION, Circuit Judge.

Plaintiffs filed a civil suit against several defendants, including two municipal attorneys, alleging violations of the Fair Credit

Reporting Act (FCRA), 15 U.S.C. § 1681 through § 1681t. The municipal attorneys filed a motion to dismiss plaintiffs' claims against them, contending that they were absolutely immune from suit. The district court denied their motion. We affirm.

## I.

## NATURE OF THE CASE

This FCRA action arises out of two lawsuits filed by current or former members of the Chicago Police Department against the City of Chicago and various city officials. The first lawsuit, *Maloney v. Washington et al.*, No. 84 C 0689 (N.D.Ill. filed Jan. 25, 1984), was filed by a single plaintiff, William Maloney. Maloney alleged that he had been unlawfully discriminated against on the basis of his race and political affiliation. He further alleged that several other members of the police department had been victims of unlawful employment practices and, like Maloney, had suffered financial harm as a result. James Montgomery, Corporation Counsel for the City of Chicago, and Donald Hubert, Special Assistant Corporation Counsel, entered appearances on behalf of the City of Chicago and the defendant city officials.

Approximately two weeks after Maloney filed suit, many of the persons named in Maloney's complaint as having suffered from unlawful employment practices also sued the City of Chicago and various city officials. This suit, *Auriemma et al. v. City of Chicago et al.*, No. 84 C 1224 (N.D.Ill. filed Feb. 8, 1984) (*Auriemma I*), filed on behalf of eighteen plaintiffs, alleged that the plaintiffs' First and Fourteenth Amendment rights had been violated. James Montgomery filed an appearance on behalf of the defendants. The district court subsequently consolidated the *Maloney* and *Auriemma I* cases for discovery purposes.

Based on actions allegedly taken on behalf of the defendants in *Maloney* and *Auriemma I*, a third lawsuit, *Auriemma II*, soon appeared. Sixteen of the eighteen *Auriemma I* plaintiffs filed a civil suit against, among others, Montgomery, Hubert, and Investigative Consultants, Inc. (Investigative Consultants). The complaint alleged that Montgomery and Hubert violated the FCRA by hiring Investigative Consultants to obtain credit reports on the plaintiffs from a credit reporting agency through the use of false pretenses. See 15 U.S.C. § 1681q.[1] According to the complaint, Investigative Consultants then obtained oral and written credit reports on plaintiffs for an unauthorized purpose under the FCRA. See 15 U.S.C. § 1681b.[2]

---

1. 15 U.S.C. § 1681q provides:

### Obtaining information under false pretenses

Any person who knowingly and willfully obtains information on a consumer from a consumer reporting agency under false pretenses shall be fined not more than $5,000 or imprisoned not more than one year, or both.

Although § 1681q is a criminal statute, several courts have held that a person may sue for civil damages for violations of that provision. 15 U.S.C. § 1681n allows persons to maintain a cause of action against persons who willfully violate any "requirement" of the FCRA. Because § 1681 is a "requirement" of the FCRA, the courts have reasoned, a person may sue under 15 U.S.C. § 1681n for violation of § 1681q. *See Zamora v. Valley Federal Savings & Loan Ass'n*, 811 F.2d 1368, 1370 (10th Cir. 1987); *Kennedy v. Border City Savings & Loan Ass'n*, 747 F.2d 367, 369 (6th Cir.1984).

2. 15 U.S.C. § 1681b provides:

**Permissible purposes of consumer reports**

A consumer reporting agency may furnish a consumer report under the following circumstances and no other:

(1) In response to the order of a court having jurisdiction to issue such an order.

(2) In accordance with the written instructions of the consumer to whom it relates.

(3) To a person which it has reason to believe—

(A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer; or

(B) intends to use the information for employment purposes; or

(C) intends to use the information in connection with the underwriting of insurance involving the consumer; or

(D) intends to use the information in connection with a determination of the consumer's eligibility for a license or other benefit granted by a governmental instrumentality re-

The complaint further alleged that Montgomery and Hubert intended to use the information to embarrass and intimidate the plaintiffs and that the information was, in fact, subsequently disseminated.

█ Hubert and Montgomery filed a motion to dismiss, contending that even if the complaint's allegations were true, they were absolutely immune from civil liability because the alleged misconduct took place as part of their representation of the City of Chicago and the defendant municipal officials in the *Auriemma I* and *Maloney* suits. The district court denied their motion to dismiss. This appeal followed.[3]

## II.

## DISCUSSION

Hubert and Montgomery argue on appeal that government attorneys are entitled to absolute immunity from suit for actions taken in preparing and presenting their clients' defense. They contend that public policy requires that they be able to prepare and present the defense of their government clients without the fear of being subjected to lawsuits filed by opposing parties. Plaintiffs contend, however, that public policy does not require granting the defendant attorneys absolute immunity from suit. According to plaintiffs, acquiring information from an extrajudicial source does not constitute the type of "quasi-judicial" function entitled to absolute immunity from suit. Rather, plaintiffs contend, the actions Hubert and Montgomery allegedly took fall within the category of administrative or investigatory acts for which executive officials are only entitled to qualified immunity. As we explain below, the district court correctly denied the defendants' motion to dismiss.

### A.

█ Absolute immunity from civil liability for damages is of a "rare and exceptional character." *Cleavinger v. Saxner*, 474 U.S. 193, 202, 106 S.Ct. 496, 501, 88 L.Ed.2d 507 (1985). Public officials seeking absolute immunity from civil liability bear the burden of showing that overriding considerations of public policy require that they be exempt from personal liability for their alleged unlawful conduct. *See Forrester v. White*, — U.S. —, 108 S.Ct. 538, 542, 98 L.Ed.2d 555 (1988); *Butz v. Economou*, 438 U.S. 478, 506, 98 S.Ct. 2894, 2910, 57 L.Ed.2d 895 (1978). To determine whether public policy requires that the actions of particular government officials be immune from suit, the Supreme Court has adopted a functional approach that looks at the nature of the functions an official performs and "the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions." *Forrester*, 108 S.Ct. at 542. This functional approach does not allow for mechanical rules but instead requires the analysis of several factors. Three factors that have been found to be particularly important in determining whether absolute immunity bars a suit are: (1) whether an historical or common law basis exists for granting an official absolute immunity from suit for performing a particular function; (2) whether performing the function poses special risks of vexatious litigation; and (3) whether sufficient safeguards exist to prevent abuses of power. *Mitchell v. Forsyth*, 472 U.S. 511, 521–23, 105 S.Ct. 2806, 2812–13, 86 L.Ed.2d 411 (1985).

Under this approach, the Supreme Court has extended to federal legislation the common law rules granting participants in judicial proceedings absolute immunity from civil liability. See *Briscoe v. LaHue*, 460

quired by law to consider an applicant's financial responsibility or status; or

(E) otherwise has a legitimate business need for the information in connection with a business transaction involving the consumer.

**3.** The denial of a motion to dismiss is generally not a final appealable order under 28 U.S.C. § 1291. The Supreme Court, however, has held

that the denial of a substantial claim of absolute immunity constitutes an appealable "collateral order" under the doctrine enunciated in *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). *See Mitchell v. Forsyth,* 472 U.S. 511 at 524–25, 105 S.Ct. 2806 at 2814–15, 86 L.Ed.2d 411 (1985). Thus, we have jurisdiction to hear this appeal.

U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983) (witnesses); *Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978) (judges). This extension includes attorneys who appear on behalf of the government. In *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), the Supreme Court held that prosecutors are absolutely immune from liability in suits challenging their decision to initiate criminal prosecutions as well as suits challenging their decisions concerning the conduct of trial and the presentation of evidence. The Court reasoned that the nature of a prosecutor's duties is likely to provoke many retaliatory lawsuits that would hamper the effective functioning of the criminal justice system by discouraging prosecutors from initiating prosecutions and presenting relevant evidence. *Id.* at 424–28, 96 S.Ct. at 992–94. As the Court explained:

> Attaining the system's goal of accurately determining guilt or innocence requires that both the prosecution and the defense have wide discretion in the conduct of the trial and the presentation of evidence.... If prosecutors were hampered in exercising their judgment as to the use of ... witnesses by concern about resulting personal liability, the triers of fact in criminal cases often would be denied relevant evidence.

*Id.* at 426, 96 S.Ct. at 993. The Court acknowledged that granting absolute immunity does impose a significant cost upon society in that some persons who are genuinely wronged are denied redress for their injuries. Nonetheless, the Court concluded that the broader public interest in the effective functioning of the criminal justice system required that prosecutors perform their duties without fear of having all their decisions relitigated in suits seeking monetary damages against them. *Id.* at 427–28, 96 S.Ct. at 993–94. Moreover, the Court noted that the possibility of criminal sanctions and professional discipline operated to check abuses by overzealous prosecutors. *Id.* at 428–31, 96 S.Ct. at 994–95.

Similarly, in *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), the Court found that agency officials who initiate administrative proceedings and agency attorneys who present evidence at such proceedings are absolutely immune from suits challenging their actions. Relying on its reasoning in *Imbler v. Pachtman*, the Court determined that absolute immunity was necessary to ensure that agency officials make decisions to initiate proceedings and to present evidence without the fear of being subjected to a suit for monetary damages. The Court expressly rejected arguments that agency attorneys in administrative proceedings were entitled to less protection than prosecutors performing similar functions. The Court pointed out that it was the nature of adjudicative proceedings rather than their location that required granting participants in such proceedings absolute immunity. *Id.* at 512, 98 S.Ct. at 2913.

> [C]ontroversies sufficiently intense to erupt in litigation are not easily capped by a judicial decree. The loser in one forum will frequently seek another.... Absolute immunity is thus necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation.

*Id.* Furthermore, the Court determined that safeguards in the judicial process such as judicial review and the ability to challenge an opponent's assertions in open court, provide significant protection against abuses by overzealous advocates.

The Supreme Court's reasoning in *Imbler* and *Butz* that absolute immunity is necessary to achieve the independent judgment and vigorous advocacy vital to our adversarial system of justice has been found equally applicable to attorneys *defending* the government in civil litigation. For example, in *Ellison v. Stephens*, 581 F.2d 584 (6th Cir.1978), the Sixth Circuit held that the Attorney General of Kentucky was absolutely immune from liability in a suit claiming that he violated the plaintiff's rights by asserting an allegedly unconstitutional affirmative defense in an earlier lawsuit filed by the plaintiff. *Cf. Skolnick v. Hanrahan*, 398 F.2d 27 (7th Cir.1968) (holding that a United States Attorney was immune from liability in a suit

alleging that, by defending various federal defendants in a lawsuit, the attorney aided and abetted the defendants' conspiracy to violate the plaintiff's civil rights).

More recently, in *Barrett v. United States*, 798 F.2d 565 (2d Cir.1986), the Second Circuit held that an Assistant Attorney General defending New York State in a medical malpractice action was absolutely immune from liability in a suit charging that he had participated with federal officials in a conspiracy to "cover up" the federal government's involvement in illegal drug testing. In so holding, the court specifically rejected the plaintiff's argument that government defense counsel were not entitled to absolute immunity because the "passive" nature of their function rendered them less likely to be the target of vexatious suits. According to the court:

> Although government defense counsel, not having selected the other party as the target of the litigation, is in a more passive position than a prosecutor or plaintiff's representative, he nevertheless functions in an adversarial arena where "there is, if not always a winner, at least one loser," [*Mitchell v. Forsyth*, 472 U.S. 511, 521, 105 S.Ct. 2806, 2813, 86 L.Ed.2d 411 (1985)], and since he is charged with a public trust he should not be inhibited in the faithful performance of his duties by the threat of harassing lawsuits against him. His function as a government advocate therefore entitles him to absolute immunity, which is "necessary to assure that ... *advocates* ... can perform their respective functions without harassment or intimidation." *Butz v. Economou*, [438 U.S. at 512, 98 S.Ct. at 2913] ...

798 F.2d at 572 (emphasis supplied in *Barrett*). The court also found support for its holding in the long-standing common law rule that attorneys are absolutely immune from liability for defamatory statements that are reasonably related to the subject matter of ongoing litigation. *Id.* at 572–73 (collecting cases). The rationale behind the common law rule is that the needs of litigants and their advocates in the judicial process require that advocates be able to vigorously present their clients' cases without having to fear being sued later on for defamation. *Id.*

■ The fact that government attorneys are entitled to absolute immunity when performing many of the functions of their offices should not, however, be confused with a blanket grant of immunity for government attorneys. Absolute immunity is designed to protect the functions that particular government officials perform, not the government officials themselves. *Compare Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978) (judges absolutely immune for judicial acts) *with Forrester v. White*, — U.S. —, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988) (judges not absolutely immune from suit for actions taken as part of the administrative functions of their office); *see also Mitchell v. Forsyth*, 472 U.S. at 521–24, 105 S.Ct. at 2812–14 (Attorney General not entitled to absolute immunity when performing national security tasks). A government attorney will often perform functions, such as investigative and administrative tasks, that are not intimately associated with the judicial process. When performing these functions the overriding public policy justification of freeing the judicial process from intimidation and harassment no longer exists to justify the costs imposed upon society by absolute immunity. *See, e.g., Barbera v. Smith*, 836 F.2d 96 (2d Cir.1987) (prosecutor's disclosure of witness' identity that led to witness' death not protected by absolute immunity even if designed to further the future prosecution of the target of the government's investigation), *petition for cert. filed*, 56 U.S.L.W. 3881 (June 28, 1988); *Barrett*, 798 F.2d at 573–78 (federal government attorneys not representing a party to a lawsuit not absolutely immune for engaging in conspiracy to prevent decedent's estate from learning of federal government's involvement in decedent's death). *Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir.1979) (prosecutor's involvement in publicity campaign not entitled to absolute immunity), *rev'd in part on other grounds*, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980). Therefore, "[i]f the function [is] administrative or investigato-

ry, the official enjoys only qualified immunity." *Henderson v. Lopez*, 790 F.2d 44, 46 (7th Cir.1986).

Unfortunately, the rule that a government attorney is entitled to absolute immunity when acting in a "quasi-judicial" function but only qualified immunity when acting in an "investigative" or "administrative" role is much more easily stated than applied. The absolute immunity of an advocate is not confined strictly to actions taken in the courtroom, *see, e.g., Barrett*, 798 F.2d at 573, and, at least with regard to prosecutors, the Supreme Court has clearly indicated that absolute immunity may attach to some decisions regarding obtaining, reviewing, and evaluating evidence. *See Imbler*, 424 U.S. at 431 n. 33, 96 S.Ct. at 995 n. 33. Yet, investigative activities by attorneys or other executive officials are generally not entitled to absolute immunity. *See, generally, Mitchell v. Forsyth*, 472 U.S. at 521–24, 105 S.Ct. at 2812–14 (1985); *Henderson*, 790 F.2d at 46. This is so even though one may safely assume that government officials often expect that the fruits of any such investigation may ultimately end up in court. It is only when such activities are intimately associated with the court-related duties of government attorneys that the activities are entitled to absolute immunity. *See Imbler*, 424 U.S. at 430, 96 S.Ct. at 994; *Barbera*, 836 F.2d at 101.

### B.

In the present case, the district court correctly concluded that the alleged extra-judicial investigation of plaintiffs was not so intimately associated with the judicial process that public policy requires that the defendant attorneys be absolutely immune from suit. As noted above, the primary reason for granting attorneys absolute immunity is that their unique function as advocates requires that they be able to present their client's case at trial without intimidation or harassment. Although subject to abuses, there are sufficient safeguards in the judicial process to protect litigants from overzealous advocates. These same reasons would also warrant extending absolute immunity to actions taken by advocates within the broad confines of the civil discovery procedures available in both state and federal courts. *Cf. Imbler*, 424 U.S. at 431 n. 33, 96 S.Ct. at 995 n. 33 (noting that the proper performance of the prosecutorial function "may require the obtaining, reviewing, and evaluating of evidence."). Conducting discovery under the rules of civil procedure falls within the unique duties of an advocate and such activities are conducted in the adversarial arena where opposing counsel and the trial court can quickly put the brakes on unethical or unlawful behavior. The same cannot be said, however, for pretrial investigations that occur outside the rules of discovery.

When an attorney in a civil suit steps beyond the rules of discovery to obtain facts in an extra-judicial investigation, he steps into a gray area where his actions start closely resembling those of a police officer or private investigator. Although there is certainly nothing wrong with an attorney conducting extra-judicial investigations, the conduct of such investigations is removed from the judicial process and is not a function that rests uniquely within the duties of an advocate. More important, such investigations take place outside the adversarial arena with its attendant safeguards that provide real and immediate checks to abusive practices. "[T]he judicial process is largely self-correcting: procedural rules, appeals, and the possibility of collateral challenges obviate the need for damages actions to prevent unjust results." *Mitchell v. Forsyth*, 472 U.S. at 522–23, 105 S.Ct. at 2813. False or unreliable evidence presented at trial is subject to immediate exposure "through cross-examination, rebuttal, or reinterpretation by opposing counsel." *Butz*, 438 U.S. at 516–17, 98 S.Ct. at 2916. Likewise, the presence of opposing counsel and opposing counsel's ability to seek swift protection from the court serve as substantial checks upon abusive discovery practices. An allegedly unlawful investigation conducted outside the discovery process is not subject to these significant safeguards and protections. While the possibility of criminal prosecu-

tion under the FCRA, see 15 U.S.C. § 1681q, professional discipline, or having the trial court exercise its supervisory powers under the "All Writs Act," see 28 U.S. C. § 1651, will certainly act as a deterrent to some unlawful conduct, the likelihood of these sanctions being invoked is speculative at best. This is particularly so given that many, if not most, extra-judicial investigations will be conducted without the knowledge of the opposing side. Thus, people who are injured by extra-judicial investigations may not know that their rights have been violated, much less know the identity of the persons who violated their rights. Moreover, even if the injured party is aware of all the facts, there is little incentive to invoke these sanctions except in particularly egregious situations.

Hubert and Montgomery nonetheless argue that absolute immunity attaches to their alleged actions because they were related to their duties as defense counsel for their governmental clients. They claim strong support for this argument in the Second Circuit's decision in *Barrett v. United States*, 798 F.2d at 573, where, as noted earlier, the court held that an attorney defending New York State in a medical malpractice action was absolutely immune from a suit claiming that he participated in a conspiracy to suppress evidence of the federal government's involvement in unlawful drug experiments. The Second Circuit's holding in that case, however, is closely analogous to the now well-settled rule that a prosecutor cannot be held personally liable for the knowing suppression of exculpatory information. *See Imbler*, 424 U.S. at 431 n. 34, 96 S.Ct. at 995 n. 34; *see also Heidelberg v. Hammer*, 577 F.2d 429, 432 (7th Cir.1978) (prosecutor absolutely immune from suit claiming that he destroyed and falsified evidence). The rationale for this rule is that prosecutors must be able to exercise their judgment in determining whether to present or not present evidence at trial without having to fear being subject to personal liability for their decisions. *Imbler*, 424 U.S. at 431 n. 34, 96 S.Ct. at 995 n. 34. *But see Imbler*, 424 U.S. at 441–45, 96 S.Ct. at 1000–02 (White, J., concurring) (arguing that abso-

lute immunity should not be granted when there is suppression of evidence). The factual allegations in the present case, however, do not deal with the same type of situation where an attorney is being sued based on his decision to produce or not produce certain evidence. Rather, plaintiffs seek relief based on alleged unlawful investigative activities which traditionally fall outside the scope of absolute immunity.

Hubert and Montgomery further argue that exposing government attorneys to liability for actions taken in pretrial investigations will stifle their ability to prepare and present their case. We disagree. The absolute immunity granted government attorneys in cases such as *Butz, Ellison,* and *Barrett* discussed above gives government attorneys extremely wide latitude in deciding how to conduct their client's case and what evidence to present at trial. Limiting government defense attorneys to qualified immunity when conducting investigations outside the controls of the judicial process in no way diminishes the absolute immunity that attaches to the vital functions they perform that are intimately related to the judicial process. Moreover, even when performing extra-judicial investigations, the existence of qualified immunity allows for a broad range of discretion within which attorneys can operate. All a person need do to avoid personal liability under qualified immunity is to refrain from violating a person's "clearly established statutory or constitutional rights of which a reasonable person would have known." *See Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). This is hardly too much to ask government attorneys when conducting investigations.

Undoubtedly, government defense attorneys may be subject to lawsuits filed by unhappy litigants who resent an attorney's vigorous advocacy. But we fail to see how merely allowing them qualified immunity when performing extra-judicial activities will result in a flood of lawsuits that will significantly detract from the proper performance of their duties. In the first place, the fact that extra-judicial investigations are typically not carried out in the

open makes it likely that many real or imagined abuses will not come to the attention of the other side and, thus, not be litigated. *Cf. Mitchell v. Forsyth,* 472 U.S. at 522, 105 S.Ct. at 2813 (noting that threat of vexatious lawsuits against Attorney General for his participation in national security task is slight because of secret nature of such proceedings). Indeed, defendants have only cited three cases in which government defense counsel have been sued in the last twenty years and none of these cases involved pretrial investigations of a plaintiff. Moreover, in the limited circumstances where government defense counsel are subject to suit, the existence of qualified immunity and an attorney's ability to obtain sanctions under 28 U.S.C. § 1927 and Fed.R.Civ.P. 11 are powerful antidotes to any litigation abuses. Finally, we note that the threat of exposure to liability is not necessarily a bad thing. After all, suits against public officials are designed to discourage official misconduct as well as to compensate the victims of misconduct. *See Forrester,* 108 S.Ct. at 542.

In sum, we conclude that the defendant government attorneys have failed to satisfy their burden of showing that overriding considerations of public policy require that they be absolutely immune from personal liability for violations of the FCRA while investigating plaintiffs who have brought suit against a governmental entity. "Absolute immunity ... is 'strong medicine, justified only when the danger of [officials' being deflect[ed from the effective performance of their duties] is very great.'" *Forrester,* 108 S.Ct. at 545 (quoting *Forrester v. White,* 792 F.2d 647, 660 (7th Cir.1986) (Posner, J., dissenting)). The costs of leaving unlawful conduct unremedied under the circumstances of this case outweigh any potential benefits to be gained by the judicial process by granting such immunity. In so holding, we emphasize that we in no way diminish the absolute immunity traditionally granted government counsel for their participation in the judicial process. We also emphasize that we express no opinion on whether, under similar circumstances, the unique functions performed by prosecuting attorneys would entitle them to greater immunity than that afforded government defense counsel. We merely hold that the conduct alleged in this complaint is sufficiently removed from the judicial process that the government defense attorneys should not be entitled to any greater protection than the qualified immunity to which executive officials are normally entitled. Accordingly, the decision of the district court is

AFFIRMED.